## A10A1274. GRANGE MUTUAL CASUALTY COMPANY v. FULCHER.

### (701 SE2d 547)

MIKELL, Judge.

Tony Andrew Fulcher filed a declaratory judgment action against Grange Mutual Casualty Company, Stacy Marquell Riden, David Trapp, and David Trapp Sales, LLC d/b/a David Trapp Sales ("Trapp").[1] Fulcher was involved in an accident with Riden, who was driving an automobile owned by Trapp. Trapp was insured by Grange Mutual under a Garage Auto Policy for the business of used car sales. Fulcher and Grange Mutual filed cross motions for summary judgment, and the trial court granted Fulcher's motion and denied Grange Mutual's, concluding that Grange Mutual was responsible for providing primary insurance coverage for the face value of its policy, $300,000, rather than the statutory minimum limit of $25,000. Grange Mutual appeals from the trial court's order. Because we conclude that the unambiguous provisions of the insurance policy specifically provided that Riden was an insured under the policy but was only insured up to the compulsory legal limits, we reverse the judgment of the trial court.

"This Court's review of the grant or denial of summary judgment is de novo in order to determine whether any genuine issue of

---

[1] David Trapp and David Trapp Sales, LLC d/b/a David Trapp Sales were dismissed from the action.

material fact exists for resolution by a jury."[2] The facts in this case are not in dispute. Stacy Riden purchased a 1990 Geo Prism from Trapp during the summer of 2003. Riden deposed that the purchase price for the Geo was approximately $4,000, and that she made a $300 down payment and agreed to make $50 weekly payments; that two months after taking possession of the Geo, she returned to Trapp to report that the gears on the car would not change; that she was without a vehicle for a month while the Geo was at Trapp; and that during that month, Trapp told her that the Geo needed a new transmission and that they would try to repair the car.

While visiting Trapp to make her weekly payment on the Geo, Riden complained about not having a car and Trapp loaned her a 1993 Nissan Coupe. On November 30, 2003, while Riden was driving the Nissan, she collided with a motorcycle driven by Fulcher. When the accident occurred, Riden had no insurance as her policy had been cancelled approximately two months earlier. Fulcher filed a lawsuit against Riden and the instant declaratory judgment action.

On summary judgment, Fulcher argued that the Grange Mutual policy provided $300,000 of coverage for the injuries he sustained in the accident, and Grange Mutual contended that, at most, the policy provided coverage in the amount of $25,000, Georgia's compulsory statutory limit. The trial court agreed with Fulcher. Reasoning that Trapp was acting as a U-drive-it agency when it loaned the car to Riden, the court concluded that public policy dictated that Fulcher was entitled to coverage of $300,000. On appeal, Grange Mutual argues in three separate enumerations of error that the trial court erred when it determined the following: (1) Trapp was a U-drive-it agency; (2) public policy dictated that Riden was entitled to $300,000; and (3) the policy was ambiguous because it did not define "customer." Because we conclude that the policy unambiguously limited coverage in this instance to the compulsory statutory limit, we address these related errors simultaneously and reverse.

"As an initial matter, we must employ the standard rules of contract construction to determine the meaning of the provisions of an insurance policy."[3]

> Under Georgia law, insurance companies are generally free to set the terms of their policies as they see fit so long as they do not violate the law or judicially cognizable public policy. Thus, a carrier may agree to insure against certain

---

[2] (Citation omitted.) *QBE Ins. Co. v. Couch Pipeline &c.*, 303 Ga. App. 196, 197 (692 SE2d 795) (2010).

[3] *Owners Ins. Co. v. Smith Mechanical Contractors*, 285 Ga. 807, 808 (2) (683 SE2d 599) (2009).

risks while declining to insure against others. In construing an insurance policy, we begin, as with any contract, with the text of the contract itself. Where the contractual language unambiguously governs the factual scenario before the court, the court's job is simply to apply the terms of the contract as written, regardless of whether doing so benefits the carrier or the insured.[4]

The policy at issue defined "insured" as follows:

1. Who Is An Insured. a. The following are "insureds" for covered "autos" (1) You for any covered "auto". (2) Anyone else while using with your permission a covered "auto" you own, hire or borrow except: . . . (d) Your customers, if your business is shown in the Declarations as an "auto" dealership. However, if a customer of yours (i) *Has no other available insurance (whether primary, excess or contingent), they are an "insured" but only up to the compulsory or financial responsibility law limits where the covered "auto" is principally garaged* (ii) Has other available insurance (whether primary, excess or contingent) less than the compulsory or financial responsibility law limits where the covered "auto" is principally garaged, they are an "insured" only for the amount by which the compulsory or financial responsibility law limits exceed the limit of their other insurance.[5]

The factual scenario in the case sub judice falls squarely within the definition of "insured" as contemplated in Section (2) (d) (i) of the policy. Riden had no other available insurance; thus, according to the policy, she was insured up to the compulsory legal limit.

Relying on *A. Atlanta Autosave v. Generali-U.S. Branch*,[6] the trial court concluded that Trapp "was effectively acting as a U-drive-it agency when Riden was essentially loaned the Nissan for a substantial and indefinite period of time." Therefore, the court reasoned that public policy dictated that since Riden was uninsured, Trapp should be responsible for providing primary coverage up to its limits of $300,000. But *A. Atlanta Autosave* is inapposite here. That case involved the issue of the priority of liability coverage between a vehicle renter's insurance carrier and the insurer of the rental

---

[4] (Citation omitted.) *Trinity Outdoor, LLC v. Central Mut. Ins. Co.*, 285 Ga. 583, 584-585 (1) (679 SE2d 10) (2009).

[5] (Emphasis supplied.)

[6] 270 Ga. 757 (514 SE2d 651) (1999).

vehicle.[7] As stated therein, OCGA § 40-9-102 governs the insurance requirements of U-drive-it agencies. Specifically, the statute provides as follows:

> Any person who rents motor vehicles from a U-drive-it owner is required to provide his own insurance, and insurance companies authorized to issue automobile policies in this state shall be required by the Commissioner of Insurance to provide "spot" insurance, which shall be purchased by such person before the U-drive-it owner shall be authorized to turn a motor vehicle over to such person. If a U-drive-it owner turns over any motor vehicle to any person without first ascertaining that such "spot" insurance has been obtained, the U-drive-it owner shall not, as to that particular rental transaction, be exempted from the provisions of this chapter as provided in Code Section 40-9-4.

Applying the statute, the Supreme Court held that "the U-drive-it owner, effectively the car rental agency, [was] ultimately responsible for primary coverage when the renter is uninsured, even if the lack of insurance is discovered post-collision,"[8] because the statute was remedial and its purpose was "to protect the public against injury by an irresponsible renter of a U-drive-it vehicle."[9] In the instant case, however, there is no evidence in the record that Riden "rented" the Nissan from Trapp. The evidence is to the contrary in that Riden deposed specifically that she did not have to pay for the use of the Nissan but continued to make payments on the Geo while Trapp repaired her car. Thus, OCGA § 40-9-102 is not applicable here.

As stated in the policy at issue, Trapp was a used car dealer, which is defined in OCGA § 43-47-2 (17) (A) as follows:

> "Used motor vehicle dealer," "used car dealer," or "licensee" means any person who, for commission or with intent to make a profit or gain of money or other thing of value, sells, exchanges, rents with option to purchase, offers, or attempts to negotiate a sale or exchange of an interest in used motor vehicles or who is engaged wholly or in part in the business of selling used motor vehicles, whether or not such motor vehicles are owned by such person. A motor vehicle wholesaler and a motor vehicle broker shall be deemed to be a used motor vehicle dealer or

---

[7] Id. at 758 (1).

[8] Id. at 760 (2).

[9] Id. at 759 (2).

a used car dealer for the purposes of this chapter. Any independent motor vehicle leasing agency which sells or offers for sale used motor vehicles shall be deemed to be a used motor vehicle dealer or a used car dealer for the purposes of this chapter. . . .

In reaching its conclusion that Trapp was a U-drive-it agency, the court stated that it had "found no case legally defining material distinctions between a garage, dealership, and U-drive-it agency." But the statutes clearly distinguish the business types. The trial court also stated that monetary benefit flowed to Trapp from Riden's use of the Nissan, but as stated earlier, the evidence of record is to the contrary, as the trial court acknowledged in its order when it stated that "[w]hile in possession of the borrowed Nissan, Riden returned to Trapp weekly to make the fifty dollar ($50) payments on the Geo."

The statute that pertains to the liability insurance requirements for used and new motor vehicle dealers is OCGA § 33-34-3 (d), which addresses the priority of liability coverage as between the insurer of the owner of the car and that of the nonowner/ nonemployee driver of the vehicle, in the event the vehicle is involved in an accident. The statute provides that

[e]ach policy of liability insurance issued in this state providing coverage to motor vehicles owned by a person, firm, or corporation engaged in the business of selling at retail new and used motor vehicles shall provide that, when an accident involves the operation of a motor vehicle by a person who is neither the owner of the vehicle involved in the accident nor an employee of the owner and the operator of the motor vehicle is an insured under a complying policy other than the complying policy insuring the motor vehicle involved in the accident, primary coverage as to all coverages provided in the policy under which the operator is an insured shall be afforded by the liability policy insuring the said operator and any liability policy under which the owner is an insured shall afford excess coverages. If the liability policy under which the owner is an insured and which affords excess coverage contains a provision which eliminates such excess coverage based on the existence of coverage provided in the operator's liability policy, such provision of the owner's liability policy shall be void.

Although here we are not dealing with the priority of coverage between two different insurance policies because Riden had no

coverage, our holding in the instant case comports with the intent of the statute.[10] Essentially, Grange Mutual provides the primary coverage in the case because Riden was uninsured, but its policy provisions govern, unambiguously providing that Riden, as a customer, is considered an insured, up to the compulsory legal limits.[11] Therefore, the trial court erred when it concluded otherwise.

*Judgment reversed. Smith, P. J., and Adams, J., concur.*

## DECIDED SEPTEMBER 16, 2010.

*Mozley, Finlayson & Loggins, Curtis J. Martin II,* for appellant. *Strickland, Chestnut & Lindsay, John J. Lindsay,* for appellee.

---

[10] Had the policy denied coverage altogether because the customer was not an employee of the owner or had it limited the coverage to an amount less than the compulsory limits, such restrictions would have violated public policy. See *Hendrix v. Universal Underwriters Ins. Co.,* 263 Ga. App. 589, 592 (588 SE2d 761) (2003) (where a dealership's customer had an accident in a loaner vehicle, policy provision limiting excess coverage to $5,000 was declared void in light of OCGA § 33-34-3 (d), and the insurer was liable up to compulsory statutory limits) (physical precedent only).

[11] See generally OCGA § 33-7-11.